**TRAMP OIL AND MARINE, LTD.,**
**Plaintiffs, Appellants,**

v.

**M/V "MERMAID I", Her Engines, etc.,**
**et al., Defendants, Appellees.**

**No. 86–1240.**

United States Court of Appeals,
First Circuit.

Nov. 14, 1986.

---

Peter Skoufalos with whom Michael G. Chalos, and Chalos, English & Brown, P.C., New York City, were on brief, for appellants.

J. Ramon Rivera-Morales with whom Jimenez, Graffam & Lausell, San Juan, P.R., was on brief, for appellees.

Before COFFIN, Circuit Judge, WISDOM * and ALDRICH, Senior Circuit Judges.

COFFIN, Circuit Judge.

Appellant Tramp Oil and Marine, Ltd. (Tramp), a broker of bunker fuel, was literally stuck in the middle of the transaction when the appellee-vessel M/V Mermaid I (Mermaid) was supplied with fuel while in the port of Savannah, Georgia. Although everyone else involved in the five-party deal received payment, Tramp was left with an unpaid balance in excess of $46,-000. The question before us is whether Tramp is entitled to a maritime lien against the vessel to secure payment of that debt. We conclude that it is not, and therefore affirm the judgment of the district court.

## I.

The bunker fuel for which Tramp seeks payment originally was requested by the Mermaid, through its master, from Logos Shipping APS (Logos), of Copenhagen, Denmark.** Logos, the vessel's charterer, responded by asking J & L Bunkers A/S (J & L), also of Copenhagen, to make the

arrangements for supplying the fuel. J & L, in turn, contacted Tramp, of England, a bunker fuel broker. Tramp entered into an agreement with Exxon International (Exxon), who caused Colonial Oil Industries, Inc. (Colonial) to supply the oil to the Mermaid in Savannah.

Tramp paid Exxon in full, and Exxon paid Colonial. Tramp then sent an invoice for $91,360.14 for the fuel addressed to J & L and its parent company, Jensen and Larsen A/S (Jensen), as well as to the owner and master of the Mermaid. J & L billed Logos, who paid J & L in full. J & L, however, paid only $45,000 to Tramp who, after unsuccessful efforts to collect the balance, filed this action in rem against the Mermaid, claiming a maritime lien against the ship under 46 U.S.C. § 971. The district court concluded that Tramp was not entitled to such a lien, and granted the Mermaid's motion for summary judgment, 630 F.Supp. 630. Tramp then filed this appeal.

## II.

The Federal Maritime Lien Act, 46 U.S.C. § 971, provides, in pertinent part:

Any person furnishing repairs, supplies ... or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem....

No one disputes that Exxon and Colonial, as direct suppliers of the fuel to the Mermaid, would be entitled to a maritime lien. Fuel is unquestionably a "necessary" within the meaning of the Act, and it was furnished upon the order of someone with authority to do so. The question before us is whether Tramp acquired the suppliers' rights to the lien when it paid Exxon in full for the fuel.

* Of the Fifth Circuit, sitting by designation.

** In our previous consideration of this case, we concluded that the district court erred in dismissing Tramp's action on the ground of *forum non conveniens.* 743 F.2d 48 (1st Cir.1984). Our recitation of the facts is drawn largely from that opinion.

Tramp's theory is that it acquired the lien by making an "advance" on behalf of the Mermaid. The rule of advances, developed through admiralty case law, is that:

Any person advancing money to a ship on the order of the master or one intrusted with her management and for the purpose of satisfying outstanding or future lien claims against the vessel is entitled to a lien of equal dignity with the one replaced, provided the amounts so advanced are actually applied to the payment of such debts.

2 *Benedict on Admiralty* § 33, at 3–12—3–13 (7th ed. 1986) (footnotes omitted). *See also* G. Gilmore & C. Black, *The Law of Admiralty* (2d ed. 1975); W. Tetley, "Assignment and Transfer of Maritime Liens: Is There Subrogation of the Privilege," 15 J. Mar. L. & Com. 393, 411–12 (1984).

██ Thus, the rule of advances has three significant requirements: (1) that the money be advanced to a ship, (2) that it be advanced on the order of the master or someone with similar authority, and (3) that the money be used to satisfy an outstanding or future lien claim. In this case, there is no question that Tramp's payment was used to satisfy an outstanding lien claim. And while the advance here was not actually made *to the ship*—the funds instead going directly from Tramp to Exxon—payments made to a third party *on behalf of* the vessel also may constitute advances. *See, e.g., International Paint Co. v. M/V Mission Viking*, 637 F.2d 382, 385 (5th Cir.1981) (catering firm, which paid its employees directly, subrogated to employees' maritime lien against the vessel); *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1207 (5th Cir.1978) (appellant repeatedly advanced money "to the Copacabana and on its behalf").

This case thus turns only on the second requirement of an advance—whether the money was paid on the order of the master or someone else with proper authority. The district court held that it was not. On appeal, Tramp argues that the district court erred because "[t]he facts in this case clearly demonstrate that the instructions to furnish the Mermaid I with bunker fuel at Savannah, emanated from the master and the charterer, Logos." Tramp's argument is misdirected. The issue here is not whether there was authority for ordering the fuel—which no one contests—but whether there was authority for paying for it on behalf of the vessel. We agree with the district court that the record is devoid of evidence that the *payment* was authorized.

██ We recognize that the "order" for an advance apparently need not be explicit. *See International Paint*, 637 F.2d at 385 (5th Cir.1981); (no indication that money advanced on behalf of vessel advanced at owner's express request); *Sasportes*, 581 F.2d at 1210 (same). But there is also no basis in this record for implying such an order. Presumably, the fiction of an implied order has been indulged because the relationship existing between the vessel and advancer warranted a conclusion that the vessel wanted, or should have wanted, the advancer to make the payment. In this case, however, no relationship existed between Tramp and the vessel, and neither the vessel owner nor the charterer even knew of Tramp until after Tramp had made the payment to Exxon. It is already a significant departure from the technical requirements of the advance rule to find an advance when a payment is made not to the ship but to a third party, and only on the *implied* order of the vessel's manager. To also find an implied order for an advance when no person with authority to issue such an order even knows of the purported advancer stretches the fiction too far. Tramp has pointed us to no case, and we have found none, in which an order for an advance has been implied even in the absence of a relationship between the vessel management and the advancer.

██ In addition, we reject the notion that an order for an advance could be implied from the relationship of Tramp with *J & L*, on the theory that J & L was the agent of the charterer, Logos, and thus had the requisite management authority to or-

der an advance. There is no evidence that the relationship between Logos and J & L was other than purely contractual for the sole purpose of purchasing fuel. Thus, we conclude that Tramp did not fulfill the requirements of the advance rule, and therefore did not acquire a maritime lien by operation of law.

■ We also find no error in the district court's conclusion that the suppliers' maritime lien was not transferred to Tramp under principles of equity. The primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services. *See* H.Rep. No. 92–340, 92nd Cong., 1st Sess., *reprinted in* 1971 U.S. Code Cong. & Ad. News 1363–65; *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield,* 658 F.2d 363, 367 (5th Cir.1981), *cert. denied,* 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982) ("The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States.").

■ With this purpose in mind, and in light of the principle that maritime liens are to be strictly construed, *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,* 608 F.2d 197, 200–01 (5th Cir.1979), we decline to extend the law for Tramp's benefit in the circumstances of this case. Tramp is a foreign broker, not an American supplier, and thus not the intended beneficiary of the Maritime Lien Act. We are unpersuaded by Tramp's argument that recognizing a lien in favor of intermediate brokers like itself would promote prompter payment to American suppliers since such brokers would be more willing to "advance" payment to the suppliers. Brokers like Tramp already have the means to protect their interests, with no additional delay in payment to the suppliers, by securing an assignment of the suppliers' lien, and notifying the vessel of that simple transaction. *See* G. Gilmore & C. Black, *The Law of Admiralty* 634 (2d ed. 1975) ("Modern

cases without exception assume that liens can be assigned").

■ We therefore think it unnecessary to protect American suppliers, and unfair to the vessel, to extend the availability of a maritime lien directly to an intermediate broker unknown to the vessel, particularly when the vessel already has made a prompt and full payment for its supplies. Appellee persuasively points out that if any one of a series of intermediate brokers with no relationship to the vessel could impose a maritime lien, a vessel seeking to avoid a lien would be forced to delve far deeper into every transaction than is commercially reasonable. Moreover, it seems clearly preferable to insist upon the slight technical requirement of obtaining an assignment than to open a wide door to the proliferation of maritime liens. The maritime lien is a special privilege, "operat[ing] to the prejudice of general creditors and purchasers without notice," *Vandewater v. Mills (The Yankee Blade),* 60 U.S. (19 How.) 82, 89, 15 L.Ed. 554 (1857), and its open-ended extension could radically change the presuppositions of maritime commerce.

As Tramp observes, the Lien Act represents a balance between the equities of the "innocent" vessel and those of American materialmen. A lien in this case would weigh heavily on the vessel without affording comparable benefit to the materialmen. We therefore hold that Tramp is not entitled to a maritime lien against the Mermaid.

*The judgment of the district court is affirmed.*