829 F.2d 751
 1988 A.M.C. 609
 INTERNATIONAL SEAFOODS OF ALASKA, INC., Plaintiff-Appellee,
v.
PARK VENTURES, INC., Defendant-Appellant,
and
W. Anthony Lusk; Darrell Kenneth Kinsey; O/S DONALD E, her
engines, tackle, etc., Defendants.
 No. 86-3693.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 5, 1987.
Decided Sept. 30, 1987.
 
 Sara E. Heideman, Anchorage, Alaska, for plaintiff-appellee.
 Ann K. Stokes, Anchorage, Alaska, for defendant-appellant.
 Appeal from the United States District Court for the District of Alaska.
 Before GOODWIN, ANDERSON and BRUNETTI, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Park Ventures, Inc. appeals (1) two elements totalling $32,000 of a $53,195.91 maritime lien judgment entered against the fishing vessel Donald E, and (2) the in personam judgment entered against it. We affirm in part, reverse in part, and vacate in part.
 
 
 2
 Park Ventures is a shipbuilding company with facilities in Mobile, Alabama. In 1980, it built a fishing vessel for use in the Alaska fishery and entered into a contract to sell the vessel, now known as the Donald E, to Lusk & Associates. Ken Kinsey was an associate in Lusk & Associates. After agreeing to buy the vessel, Kinsey approached International Seafoods of Alaska, Inc. (ISA) and offered to supply ISA with herring during the upcoming herring fishing season. Kinsey told ISA that he was a part owner of the Donald E--as a member of Lusk & Associates--and would need a money advance to bring the vessel from Mobile, Alabama, to Kodiak, Alaska, in time for the season. On or about January 19, 1981, ISA signed a fish tendering contract with Kinsey and advanced $12,000 to Kinsey to cover expenses in connection with readying the Donald E for the trip to Alaska.
 
 
 3
 A few days later, Kinsey flew to Mobile and began to outfit the Donald E. The Donald E sailed from Mobile for Alaska in late January 1981.
 
 
 4
 When the Donald E reached Seattle, Kinsey sent a request to ISA for a further advance of monies in order to pay crew wages and other expenses. ISA did not have a Seattle office, and it contacted the Seattle office of Samho Moolsan Company, Ltd. (Samho)--a Korean company with which ISA was engaged in a joint venture enterprise unrelated to the matters involved in this appeal. ISA asked Samho to provide $20,000 to Kinsey on ISA's behalf.
 
 
 5
 In exchange for the $20,000, Kinsey signed a note in which he personally promised to repay the ISA-SAMHO joint venture. Samho then billed ISA for the $20,000 on an invoice stating that the loan was for the "Donald E advance." ISA reimbursed Samho.
 
 
 6
 The Donald E eventually arrived in Kodiak, Alaska, and operated as a part of the fleet working for ISA during the herring fishing season. Several payments passed between ISA and Kinsey or Lusk & Associates, but the January 19, 1981 and March 12, 1981 advances were not repaid to ISA. Lusk & Associates also failed to pay Park Ventures. In August 1981, Park Ventures regained control of the Donald E. Lusk & Associates, including Kinsey, have apparently dropped from sight.
 
 
 7
 ISA commenced this action in the district court seeking a maritime lien under the Federal Maritime Lien Act, 46 U.S.C. Secs. 971-975 (1982), for monies and supplies advanced for use on the Donald E. The district court granted maritime liens amounting to $53,195.91 for ten separate claimed expenditures and entered judgment for the total amount against both the vessel in rem and against Park Ventures in personam. A special bond in the amount of $90,000 has been posted in exchange for the release of the Donald E from maritime attachment.
 
 
 8
 Entitlement to a federal maritime lien is established by proof of the elements of the federal maritime lien statute, 46 U.S.C. Sec. 971 (1982). Section 971 provides:
 
 
 9
 Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.
 
 
 10
 Id. Thus, to prevail, lien claimants must have "(1) furnish[ed] repairs, supplies, or other necessaries, (2) to any vessel, (3) 'upon the order of the owner of such vessel, or of a person authorized by the owner.' " Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd., 808 F.2d 697, 699 (9th Cir.1987).
 
 
 11
 As a guiding principle, we recognize at the outset that because maritime liens are a preference which operate as "secret liens," the statutes which create them are construed stricti juris in a technical and precise manner. Melwire Trading Co., Inc. v. M/V Cape Antibes, 811 F.2d 1271, 1273 (9th Cir.1987); Foss Launch, 808 F.2d at 702.
 
 
 12
 The first question presented is whether the January 19, 1981 advance was made on the authority of an authorized person. Sections 972 and 973 of the Act discuss in some detail the types of persons authorized to incur maritime liens against a vessel. Section 972 grants a presumption of authority to, among others, the "owner" and "any person to whom the management of the vessel at the port of supply is intrusted." 46 U.S.C. Sec. 972 (1982).[1] Section 973 complements and expands the range of persons described in section 972 by providing that an officer or agent of "an agreed purchaser in possession of the vessel" may also be entitled to a presumption of authority. 46 U.S.C. Sec. 973 (1982).[2]
 
 
 13
 Our reading of the plain meaning of the two sections is that for an agent of an "agreed purchaser in possession" under section 973 to benefit from the section 972 presumption, that person must also be an agent of a qualifying section 972 person. Thus, in this case, with respect to the January 19, 1981 advance, we must determine whether Kinsey was then an agent of (1) an "owner" or a "managing owner" of the Donald E within the meaning of section 972, or (2) "an agreed purchaser in possession" within the meaning of section 973 who was also a person "intrusted with management" of the Donald E "at its port of supply" within the meaning of section 972.
 
 
 14
 Kinsey was not an agent of an "owner" or a "managing owner" of the Donald E on January 19, 1981. It is true that Lusk & Associates had agreed to purchase the Donald E prior to that date and that Kinsey was Lusk & Associates' agent in Alaska. However, even if on January 19, 1981, Lusk & Associates had "equitable title" to the vessel, the equitable interest under the contract did not rise to the level of ownership required by section 972. Record title to the Donald E remained with Park Ventures, and, consequently, Park Ventures was still the "owner" on January 19, 1981. Lusk & Associates was also not then the "managing owner" of the vessel because it had not taken possession and had not been so appointed by Park Ventures. The bare existence of an equitable right to assert management authority over the vessel does not amount to "managing owner" status. If it did then there would have been no need for Congress to include the category of "agreed purchaser in possession" in section 973.
 
 
 15
 Kinsey was an agent of an "agreed purchaser" at the time of the first advance. Section 973, however, permits authorization only by an officer or agent of an "agreed purchaser in possession." Appellees, relying primarily on The Oceana, 233 F. 139 (E.D.N.Y.1916), mod. on other grounds, 244 F. 80 (2d Cir.), cert. denied, 245 U.S. 656, 38 S.Ct. 13, 62 L.Ed. 533 (1917), argue that an "agreed purchaser in possession" includes any person who has obtained "the intended right to enjoy the property." Id. at 148.
 
 
 16
 A careful reading of The Oceana, however, reveals that the case stands for nothing more than the proposition that section 973 "possession" can be established where the agreed purchaser has exercised physical control over a vessel. There, the district court granted maritime liens against the vessel for supplies received during periods in which representatives of the agreed purchaser had actually been on board the vessel. By the fact that "Crosby, the purchasing agent, and Saunders, the chief steward and commissary" were present when deliveries were made, the agreed purchaser had blatantly manifested physical control over the vessel. The Oceana, 233 F. at 148-49. Thus, the sweeping language in the decision which suggests that "constructive" possession of a vessel can suffice is entirely unsupported dictum. Id. Accord The Henry W. Breyer, 17 F.2d 423, 426 (D.Md.1927) (court determined that agreed purchaser was "in possession" of vessel in vendor's drydock after purchaser's "captain, officers, and crew were on board the ship, busily engaged in equipping it for sea").
 
 
 17
 More important, the suggested expansive interpretation of the section 973 "agreed purchaser in possession" language would render the limiting terms "in possession" redundant. Adoption of the theory that "in possesion" can be shown solely by proof of contractual intended right of enjoyment would have the result that all "agreed purchasers" are automatically "in possession." We are unwilling to subject the language of section 973 to such strain. We conclude that the Act requires an agreed purchaser to exercise some form of actual physical control over a vessel to attain the status of an "agreed purchaser in possession."
 
 
 18
 Our interpretation of section 973 is bolstered by brief consideration of the circumstances surrounding the January 19, 1981 advance. ISA provided the $12,000 to Kinsey without undertaking even a perfunctory inquiry into the ownership or management status of the vessel. Kinsey received the advance and then flew from Alaska to Alabama and boarded the vessel for the first time. In essence, the Donald E was threatened with the attachment of a secret lien by an agent of an agreed purchaser still a stranger to the vessel.
 
 
 19
 We hold that a party does not attain the status of "an agreed purchaser in possession" for section 973 purposes without exercising actual physical control over the vessel. A contracting party's intended right to control the vessel's movements, without more, is insufficient.[3] The district court therefore erred in extending the section 972 presumption of authority to Kinsey. On January 19, 1981, Kinsey was not an agent of "a person authorized" to incur a section 971 maritime lien against the Donald E. Thus, the $12,000 that ISA provided to Kinsey did not give rise to a federal maritime lien.[4]
 
 
 20
 The next question we must face is whether ISA is entitled to a maritime lien for the $20,000 that it advanced on March 12, 1981, to Kinsey through the offices of Samho in Seattle. The district court determined that ISA had an enforceable lien arising by subrogation to Samho's lien rights. However, we need not decide whether Samho had a valid lien or whether such lien was validly transferred to ISA. We view the transaction in an entirely different manner but may affirm on any theory supported by the facts. Bancorp Leasing & Financial Corp. v. Agusta Aviation Corp., 813 F.2d 272, 276 n. 5 (9th Cir.1987); Smith v. Block, 784 F.2d 993, 996 n. 4 (9th Cir.1986).
 
 
 21
 Samho was merely a convenient financial clearinghouse for the parties negotiating the March 12, 1981 advance. The factual record of the transaction shows that ISA and Kinsey engaged in the substantive communications and negotiations leading up to the advance. Samho accommodated ISA by providing ready cash from its office in Seattle. When Kinsey received the cash, he signed a promissory note indicating that ISA and Samho would be repaid out of "gross earnings" of the 1981 herring fishing season. At the time, Kinsey was under contract with ISA to tender herring in Alaska.
 
 
 22
 Samho served the same function for ISA as a Seattle bank with which ISA had enjoyed a line of credit. Samho provided a neutral source of funds by which ISA could efficiently channel money to Kinsey in Seattle on behalf of the Donald E. Samho never intended to enter into an independent debt relationship with Kinsey. It served as the innocent conduit employed to create a debt relationship running between ISA and Kinsey on behalf of the Donald E. The debt thereby created can serve as a basis for a valid federal maritime lien. See The Golden Gate, 52 F.2d 397, 400 (9th Cir.1931), cert. denied, 284 U.S. 682, 52 S.Ct. 199, 76 L.Ed. 576 (1932).
 
 
 23
 Tramp Oil & Marine, Ltd. v. M/V Mermaid I, 805 F.2d 42 (1st Cir.1986), is not to the contrary. There, the court was presented with a claim for a federal maritime lien brought by an unreimbursed foreign oil broker caught in the middle of a chain of oil suppliers to a vessel. Primarily out of a concern for fairness to the vessel, the court denied the lien. Id. at 46. By contrast, in this action there is no chain of intermediate suppliers hoping to transfer lien rights informally amongst each other. Rather, there is only a lien claimaint who has supplied funds through a neutral but related source to a vessel on the authority of an authorized person. We therefore hold that ISA is entitled to a lien for the March 12, 1981 advance.
 
 
 24
 Appellants also assert that the district court erroneously determined that the cash advances of $12,000 and $20,000 had been spent on items lienable to the vessel. The district court determined that the money had been spent on such lienable items as food, fuel, survival suits, crew wages, and prevoyage crew transportation. All of these expenditures are for items which were reasonably necessary for the transportation of the vessel from Alabama to Alaska and therefore qualify as lienable "necessaries." Foss Launch, 808 F.2d at 699, citing 2 Benedict on Admiralty, Sec. 37 (7th ed. 1986); Equilease Corp. v. M/V Sampson, 793 F.2d 598, 603 (5th Cir.) (en banc), cert. denied, --- U.S. ----, 107 S.Ct. 570, 93 L.Ed.2d 575 (1986).
 
 
 25
 In addition, while we recognize that the testimony and documentary evidence presented to the district court somewhat imprecisely accounts for the expenditures which were made with the cash advances, after an independent review of the record, we conclude that the money was spent on lienable items.
 
 
 26
 The last question presented is whether the district court erred by entering an in personam judgment against Park Ventures. The judgment was entered in error because there is no basis for it.
 
 
 27
 The act of Park Ventures in posting a bond to obtain the release of the Donald E from maritime attachment is not a basis for in personam liability. The posting of a bond does not change the nature of a maritime lien. The bond merely changes the res against which the plaintiff may seek recovery if the lien is valid. 2 Benedict on Admiralty Sec. 63 (7th ed. 1986). The other arguments presented in defense of the in personam judgment are similarly unpersuasive. Kinsey and Lusk & Associates were never authorized to incur debts on behalf of Park Ventures. Further, the entrusting by Park Ventures of the vessel to Lusk & Associates does not indicate that Park Ventures intended thereby to ratify or to assume independent responsibility for the ISA advances to Kinsey or the vessel. In short, ISA's recovery must be in rem or not at all.
 
 
 28
 The grant of a maritime lien for the $12,000 advance of January 19, 1981, is reversed. The grant of a maritime lien for the $20,000 advance of March 12, 1981, is affirmed. The in personam judgment entered against Park Ventures is vacated.
 
 
 29
 Reversed in part, affirmed in part, and vacated in part. Neither party to recover costs.
 
 
 
 [1]
 46 U.S.C. Sec. 972 (1982) provides:
 The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.
 
 
 [2]
 46 U.S.C. Sec. 973 (1982) provides:
 The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel.
 
 
 [3]
 Requiring a contracting party to offer evidence of actual physical control over a vessel in order to incur liens against the vessel is not a particularly onerous requirement. Lienable transactions are not thereby limited to those that may take place at the vessel's port within view of the vessel. Rather, the requirement acts as a bright-line test which helps to ensure fairness to the vessel. It may even afford potential suppliers with a rapid and efficient means of measuring the availability of a federal maritime lien for necessaries which they plan to supply to a vessel
 
 
 [4]
 The conclusion that Lusk & Associates were not an "agreed purchaser in possession" for purposes of section 973 obviates the need to consider whether it, through Kinsey, was also a "intrusted manager" at the "port of supply" within the meaning of section 972
 We note in passing, however, that it is doubtful that on January 19, 1981, Lusk & Associates or Kinsey were "person[s] to whom the management of the vessel at the port of supply is intrusted." 46 U.S.C. Sec. 972 (1982) (emphasis added). Here, Lusk & Associates and its agent Kinsey were only constructively engaged in management over the Donald E at its then port of supply in Mobile, Alabama. See generally Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522 (9th Cir.1987) (general repair contractor found to lack "management" authority).